PA-Christopher Brooks Esq/Patrick Lever Esq
DA-Richard Bryant Esq

ENTERED JUL 2 8 2014

Me

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-13-150

NDM- CUM -06-13-14

48 BRAMHALL STREET
CONDOMINIUM ASSOCIATION,

Plaintiff

v.

JUDGMENT

KELLY MOSES STONE,

Defendant

STATE OF MAINE
Cumberland ss. Clerk's Office

JUN 13 2014

RECEIVED

Jury-waived trial was held in this matter. For the following reasons, judgment is entered in favor of plaintiff and against defendant on plaintiff's complaint for foreclosure by civil action.

BACKGROUND

Plaintiff filed its complaint for foreclosure on April 16, 2013. Defendant's counsel accepted service twice. Without objection, the court took judicial notice of the two acceptances of service on defendant by defendant's counsel. (Pl.'s Tabs 12-13.) No answer was filed after either acceptance of service. The court declined to grant plaintiff's motion for default before trial and preferred to hear the evidence. The defendant has, however, waived any affirmative defenses. See M.R. Civ. P. 8(c), 12(b); R.C. Moore, Inc. v. Les-Care Kitchens, Inc., 2007 ME 138, ¶ 24, 931 A.2d 1081; ABN AMRO Mortgage Group v. Willis, 2003 ME 98, ¶ 5, 829 A.2d 527.

FINDINGS

The parties stipulated at trial that defendant, who was represented by counsel but did not appear at trial, is not a minor, is not incompetent, and is not in the military.

Plaintiff 48 Bramhall Street Condominium Association was created by a Declaration of Condominium in October 2002. Amendments to the declaration addressed parking spaces and floor plans. All floor plans showed common space between the storage units. The building at 48 Bramhall Street in Portland, Maine consists of three units. (Pl.'s Tab 2 at 1.)[1]

Anne Dalphin was Secretary of plaintiff's Executive Board and became President in October 2012. Defendant was President of the Board prior to Ms. Dalphin. Justin Roig was Secretary of the Board. The Executive Board is responsible for decisions regarding the property and for the imposition of assessments. (Pl.'s Tab 2 at 25.) Ms. Dalphin reviewed and was familiar with the business records relevant to this case, including the lien and notices of fines sent to defendant.[2]

---

[1] There is some confusion about the exhibits admitted in evidence in this case. Although each of plaintiff's exhibits was marked with a tab number in the binder of exhibits submitted to the court, plaintiff's counsel used different exhibit numbers when offering them at trial. For example, the Declaration of Condominium is marked as tab 2 but was offered as plaintiff's exhibit 1 at trial. When plaintiff's counsel referenced tab 1, the lien, at trial, he also referenced exhibit 20, an attorney's fees affidavit. The lien provides for attorney's fees and costs. The lien was filed in the Cumberland County Registry of Deeds and is attached to the complaint as exhibit B.

The court asked defense counsel whether there was any objection to the exhibit and defense counsel responded that he had none. Although the record does not reflect precisely whether plaintiff's counsel offered both documents as one exhibit or the affidavit alone, the court concludes plaintiff's counsel offered both documents together and they were admitted. (Pl.'s Tabs 1, 20.)

[2] There was no Rule 803(6) objection to Ms. Dalphin's testimony. M.R. Evid. 803(6). She testified the records were made during the course of plaintiff's regularly conducted business, were made at or near the time of the event by or from information from a person with personal knowledge of the event, and plaintiff relies on the records made

2

Ms. Dalphin has been a member of plaintiff since December 2009. Defendant became the record owner of unit 3 of the building in 2006. Mr. Roig has owned unit 1 since August 2011.

### 1. Construction

In May 2012, Brian Stone, defendant's husband, informed members at plaintiff's meeting that he had obtained a marijuana prescription card. He planned to use the locked space in the basement as a grow space for six marijuana plants. Plaintiff recognized the prescription and agreed provisionally to the plan, as long as the grow project did not disturb anyone else in the building and the project was not "seen, smelled, or heard." The minutes of the May 29, 2012 meeting provide:

> Kelly [defendant] presented information and documents regarding legality and proper procedure surrounding Brian's growing plans down in the basement, explaining that his plans no longer were to run a business down there but simply to grow up to six plants for himself in the appropriate legal way, in a locked room that only Brian should have access to.
>
> The conversation turned to what sort of usage of storage spaces should be appropriate, and what would need to be involved for this growing plan to work for everyone. Priorities of Units 1 and 2 were making sure that activity in the basement didn't in any way disturb anyone else, and making sure that equal storage space was still retained by all three units after the floorplan was adjusted and clearly laid out. A plan was described which would allot three hundred square feet of space for each unit and specify which areas of the basement were storage space for each unit. Plans were made to measure space out in the basement to make sure that such spaces could be designated. This issue was decided to be revisited for a vote to designate specific spaces at the next meeting, after a proper measuring.
>
> The other major concern with the basement that was brought up was the fact that the electricity in the basement is all mixed-up, and

during the course of plaintiff's regularly conducted business. Records are kept in print form; electronic records are reduced to print form. She had personal knowledge of the assessments against defendant. (Pl.'s Tab 10.)

3

connected primarily to Unit 1 and 2's electricity bills. Making all common electricity be attached to a single condo association bill was discussed as a plan.

It was made clear that from now on any work on common elements of the building needs to be agreed upon and voted on by the board in condo meetings before any work is done, and that it is inappropriate to make use of other units' property or electricity or the like. In order to avoid miscommunication and misunderstandings, all agreed it is best that everything function as the condo documents describe. How strictly to ascribe to what the condo documents describe, such as using Robert's Rules of Order, was discussed.

* * * * *

It was agreed that we will from now on be going strictly by the condo documents, including that common spaces, in the basement and yard, for instance, should be free of personal items. Justin reiterated that anything that happens in the basement is like it is happening in Unit 1, so thin are the floors, so things like noisiness or smoking, for instance, shouldn't be happening in the basement. It was agreed that any construction or such work that happens, for instance in the basement or yard, even if in something personal like a storage space, should be checked with the other Units to make sure that the noise and such will be okay.

* * * * *

It was agreed that, by the next Tuesday, Brian would have the basement cleared of his personal stuff and work on the basement would be done so that Unit 1 and Unit 2's presently-existing storage rooms would be available.

* * * * *

That anything going on in the basement would need to not be a nuisance to other Units was brought up, and since Brian's plans for his storage space had just begun and the later stages of it had not been experienced yet, it was discussed what would need to be done to alleviate any future expectable nuisances such as noise, smell and the like. A vent in the wall being necessary was brought up, as was insulation for noise and light. It was made clear that Brian needs to be prepared for the possibility that if, as the project progresses, the association becomes uncomfortable with any qualities of the action in the basement, it would need to stop.

* * * * *

It was agreed that Brian, Justin and George would measure out the basement together the following day, to make sure that there would be sufficient realistic room down there for three equal storage spaces.

(Def.'s Ex. 1.) Plaintiff had the right to adopt and amend bylaws and rules and regulations. 33 M.R.S. § 1603-102(a)(1) (2013).

Mr. Roig agreed with Ms. Dalphin that the grow project was not to disturb anyone else in the building and the project was not to be "seen, smelled, or heard." The terms were a casual agreement, which was never subject to an official vote. These terms were important to Mr. Roig, who lived on the first floor with the basement below his unit. The building is old and he could see things through the floor, could smell anything, and even a quiet conversation could be heard in his unit.

After Mr. Stone's construction began in the basement, conversations took place about not having unauthorized construction in the basement. Plaintiff's members understood the activity was to be limited to the existing structure, just a locked storage area.

Mr. Roig went to the basement after construction started because there was significant noise. He observed a staircase had been torn down, walls knocked down, and a door and windows cemented; all of these activities took place in common areas. Mr. Roig had intended to install a washer and dryer and access them by the staircase, which connected to his unit.

Mr. Stone eventually connected three existing rooms in to one. There were two doors to two grow rooms and smells and light came from the rooms. There were a number of construction pieces in the basement. Mr. Stone had taken advantage of the fact that other storage units were not being used by the owners. In fact, Mr. Stone asked Mr. Roig if he would move to a smaller storage unit so Mr. Stone could store equipment in the Roig unit. Because Mr. Stone's construction took place in a common area, Mr. Roig told Mr. Stone the

5

construction had to be discussed at an Association meeting and that a vote was required to permit the construction.

The common space between the storage rooms contained an electrical box. It was always agreed upon that members would have access to that area because fuses blew regularly. In August or September 2012, Mr. Stone put up a locked steel door so the electrical box could no longer be accessed. Mr. Roig had to request to be let in the common space area by Mr. Stone, which Mr. Roig found tedious. Mr. Roig finally received a key to the door in April 2013. With regard to Mr. Roig's testimony about this issue, Mr. Stone stated, "basically he lied" because Mr. Roig received a key when the door was installed. Mr. Stone then admitted he took the key away because Mr. Roig somehow upset Mr. Stone. Mr. Roig had no access to the electrical box until an attorney advised Mr. Stone to return the key.

Defendant and Mr. Roig had constant communication regarding condominium business, including discussion that Mr. Stone's expansion and behavior in the basement was a violation of plaintiff's rules. Several efforts were made to stop the construction but plaintiff always played catch-up. Mr. Stone would inform plaintiff's members what he had done or changed, which the members did not know about and which had not been discussed at a meeting. The members of the Association told Mr. Stone that things could not be done that way and that a meeting was necessary. Mr. Stone responded that he had already done the work.

Ms. Dalphin was not aware Mr. Stone's making improvements to the building with the consent of plaintiff. She was aware Mr. Stone claimed he made roof repairs but the repairs were not finished. Plaintiff's members discussed

6

with Mr. Stone that the work was not finished and he replied he was not responsible for it. Ms. Dalphin had no knowledge of Mr. Stone's building porches on the building, although he claimed to have performed that work. She was aware Mr. Stone cemented a window and removed two staircases in the basement without plaintiff's permission and without presentation of any plans, which was a violation of plaintiff's rules and regulations.

She recalled three Association meetings. The members discussed the construction that had been done by Mr. Stone and worked to move forward by following plaintiff's documents. A conversation occurred after the work to determine how to make that work legal and to obtain permits from the City. The rules regarding the basement storage area were ultimately changed, although the change was not unanimous. (Def.'s Ex. 3.)

During Mr. Stone's testimony, he frequently appeared upset and raised his voice and he recalled a significantly different history of events. He stated he performed work on the main hallway, rebuilt a deck, and built storage units for units 1 and 2. He decided to build storage space for himself in the basement, which he stated led to this lawsuit. He went to the basement with two people from each unit and informed them about what he intended to do. He stated he asked whether that was okay. He said he gave to the other unit owners the two units he built and took the worst unit for himself.

He stated he began the work in May 2012, one month after he received his prescription. He stated he was 90% finished by October but had not put one vent through to the roof when he was told to stop work. He stated that fans and filters were not effective regarding smells because the vent was never installed. He agreed he has things in the basement and has not moved them. He agreed

7

further he blocked the window because water was pouring in. He testified plaintiff paid him $1400.00 for that work, which covered labor costs but not materials. He stated plaintiff knew all about this work. He put a lot of effort in and tried to take care of the Association.

He is very frustrated. He moved his family to Freeport because his wife could no longer deal with the situation. He was unwilling to state at trial the Freeport address because he did not want people in the courtroom to harass his wife. He currently stays in the unit at 48 Bramhall Street and has a roommate. He is a self-employed contractor and works from home. He now grows marijuana in the basement and in his unit.

He stated he invested $15,000 in building the room he needed. He told his attorney if they want me to stop, they should give back the money but that did not happen "and here we are." He stated that during meetings, the Association voted that he could do the work. A couple of months later after the construction started, one owner was abusive to Mr. Stone. He went to the basement and closed the door. According to Mr. Stone, things have "exploded" ever since.

He stated the members "hate me, gang up on me" and that a new Association took place and kicked him out. He stated they do not want to hear what he has to say, they changed the rules, and they have done things directly to bully him and to torment him. He did not take it and did not bow down to them. He stated the reason we are at trial is because he did not bow down to them. He stated since this happened, police, MDEA agents, ATF members, and City inspectors have been to his house. None issued a violation permit. He was locked out of the building when he took his dog out. Photos were taken of his mother-in-law. Mr. Roig responded that the door was to be locked because of

8

safety concerns and heat issues. The photographs were requested by the police because of the level of traffic in the area.

Eventually, defendant stepped down as president and handed the office to her husband, which was not allowed. Defendant told Mr. Roig she was being harassed because of the emails discussing Association business.

Mr. Roig no longer lives in the unit, which he now rents to others. The constant noise from the construction disrupted his family's activities, especially his baby's naps. The conditions imposed on Mr. Stone's construction were not upheld, resulting in constant noise and smells. Based on Mr. Stone's threatening behavior and refusal to comply with rules, such as locking a door, Mr. Roig no longer felt safe and moved from the building.

### 2. Assessments

Plaintiff has assessed fines against defendant's unit based on Mr. Stone's construction, which included his removal of staircases, tearing down walls, and cementing windows and which was not authorized by plaintiff, and his having personal belongings in common elements and other storage areas.[3] A condominium association may "levy reasonable fines for violations of the declaration, bylaws and rules and regulations of the association." 33 M.R.S. § 1603-102(a)(11); see Tab 2, §§ 13.1(b)(4); 13.8.

Prior to beginning the assessments, plaintiff sent two letters of warning. Plaintiff's tab 10 provides a summary of the violations of the rules and

---

[3] Assessments were also made for excessive dog barking and unauthorized non-resident in basement common element. Further, defendant's monthly condo fee was not paid from June 1, 2013 to January 1, 2014 and an assessment of $1,400.00 was not paid. Ms. Dalphin testified, based on personal knowledge, that the summary reflected defendant's violations of the rules and regulations. Mr. Stone did not address any assessment other than those for construction. He admitted he had personal belongings in the common area that he had not moved.

regulations and delineates the violation, date, and fine assessed. The summary was sent weekly to defendant after October 30, 2012 to notify her of the ongoing problem with her account and the amount she owed to plaintiff. The last summary was sent on January 17, 2014. Plaintiff's assessments began on October 30, 2012. No other units have been assessed and no other notices of violations have been sent because there have been no other violations. If others had violated the rules, the same process would have been used.

Because plaintiff did not have a fine schedule, plaintiff researched other condominium associations' practices regarding fines prior to the imposition of assessments against the defendant. Through the research, plaintiff determined a $25.00 fine per violation was common for condominium associations. After a meeting, plaintiff determined that fine would be reasonable and consistent throughout the Association. A fine schedule was created with a fine of $25.00 per occasion, such as for smoking or for a dog barking excessively, or $25.00 per day for an ongoing violation. The fine schedule was published to the Stones and to all units of plaintiff.

Section 13.6 of the plaintiff's Declaration of Condominium provides:

> All sums assessed by the Association as a monthly assessment or special assessment shall constitute the personal liability of the owner of the Unit assessed and also, until fully paid, shall constitute a lien against such Unit pursuant to Section 1603-116 of the Act . . . The delinquent owner shall be obligated to pay (a) all expenses of the Executive Board, including reasonable attorneys' fees, incurred in the collection of the delinquent assessment by legal proceedings.

(Pl.'s Tab 2 at 27.) A lien authorized by the Declaration dated February 21, 2013 was prepared and filed in the Cumberland County Registry of Deeds. (Pl.'s Tab 1.) As of the lien date, $8,500.00 was owed to plaintiff.

10

Based on plaintiff's calculations, as of January 17, 2014, the total amount due from defendant was $36,521.00. (Pl.'s Tab 10.) This amount includes $11,025.00 for 441 days of personal belongings in the common elements and other units' storage areas; $11,025.00 for 441 days of unauthorized noise making, machines and plants; and $11,025.00 for 441 days of an unauthorized door. This amount did not include attorney's fees and costs. An affidavit of attorney's fees and costs shows plaintiff has incurred $5,123.50 in attorney's fees and $883.23 in costs through 12/9/13. (Pl.'s Tab 20.) Defendant has made no payments towards these amounts. Notice of defendant's right to cure and notice of intention to foreclose dated March 15, 2013 was mailed to defendant's address on file by first-class mail, postage prepaid, with certificate of mailing. (Pl.'s Tab 11.) The notice set forth the amount due and the date on which to cure the default.[4]

CONCLUSIONS

### 1. Violations of Rules and Regulations

This is an unfortunate situation. Two-thirds of the owners of this building have found it necessary to relocate. Plaintiff's allegation that Mr. Stone performed unauthorized construction, however, is supported by credible testimony and by plaintiff's business records. Mr. Stone did not deny that he blocked access to common areas, removed staircases, installed doors, left his things in the basement, and cemented windows. He also did not dispute that the terms of plaintiff's provisional agreement to accommodate his marijuana prescription, that the project not be seen, smelled, or heard, were violated. Instead, he argues all of his construction was known to plaintiff's members and

---

[4] Although defendant argued plaintiff had not complied with statutory notice requirements, that argument was waived. See ABN AMRO Mortgage Group, 2003 ME 98, ¶ 5, 829 A.2d 527.

11

approved by votes at the meetings. The minutes do not reflect such votes. Further, it is unlikely that Mr. Roig would have voted to approve removal of a staircase he intended to use to access a washer and dryer, especially considering the imminent birth of his child, or to approve installation of a locked door that blocked his access to the electrical box. The court accepts the testimony of Ms. Dalphin and Mr. Roig on this issue of approval. Based on this record, defendant violated the rules and regulations as summarized in plaintiff's tab 10.

## 2. Fines

The amount of $25.00 is a reasonable fine for a violation of rules and regulations. Plaintiff researched this issue and made a good faith effort to impose fines fairly and consistently. Imposition of this amount per violation appears to be a common practice among condominium associations.

More troubling is the imposition of $25.00 per day for each day the violation continues and the absence of a maximum total penalty. See, e.g., 30-A M.R.S. § 4452 (2013) (minimum and maximum penalties for violations of land use laws and ordinances vary between $2500 and $5000 unless there is a previous conviction); see also Stonington Landing Condo. Ass'n, Inc. v. Totolis, No. CV-07-5003218-S, 2009 WL 5511259, at *10 (Conn. Super. Ct. Dec. 16, 2009). The record does not reflect that this continuing assessment is a common practice among condominium associations. Beyond the date of the lien, the amount of $24,750.00 for 330 days for each of defendant's continuing violations in the common elements, which include personal belongings in the common areas and other units' storage areas, unauthorized noise making, machines and plants, and

12

unauthorized door, has not been shown to be reasonable on this record.[5] See 33 M.R.S. § 1603-102(a)(11). This is especially true because plaintiff is responsible for the common elements. (Pl.'s Tab 2, pp. 5-8.[6])

The plaintiff obtained a lien dated 2/21/13 in the amount of $8,500.00.[7] The lien included assessments totaling $2,775.00 for each of defendant's three continuing violations for 111 days, as well as for one-time violations. Defendant did not challenge the lien. These limited amounts are reasonable. After 2/21/13, the amount of $3,295.00 has been assessed against defendant for unauthorized non-resident in basement common elements, unauthorized construction, excessive dog barking, missed payments, and a missed assessment.

Accordingly, the court specifically finds that as of 1/1/14, there is due to plaintiff the amount of $11,795.00 ($8,500.00 plus $3,295.00), attorney's fees of $5,123.50, and costs of $883.23 through 12/9/13, as provided for in the declaration and by statute, plus any additional fees and costs incurred through the sale of the property.

The order of priority of the liens is as follows:

a. First, to plaintiff on its lien, dated February 21, 2013 and recorded in the Cumberland County Registry of Deeds in Book 30408, Page 270 in the amount of $17,801.73 plus additional fees and costs accruing plus interest;

---

[5] Presumably, these daily assessments continue. As of the date of this judgment, defendant would have been assessed for 149 additional days at $25.00 per day for the three continuing violations, resulting in additional assessments of $11,175.00
[6] Page 6 of Tab 2 is missing.
[7] From the first assessment on 10/30/12 until 2/21/13, the date of the lien, there are 27 single assessments of $25.00, which total $675.00. (Pl.'s Tab 10.) There are 111 days from 10/30/12 to 2/21/13. Multiplying 111 by $25.00 by 3 equals $8,325.00. Adding $8,375.00 plus $675.00 equals $9,000.00. The lien amount is $8,500.00. (Pl.'s Tab 1.)

13

b.  Second, to defendant if there are surplus funds.

Pursuant to 14 M.R.S. §§ 1602-B and 1602-C, the prejudgment interest rate is 0.00%, and the post-judgment interest rate is the statutory rate of 6.13%.

WHEREFORE, the court directs that an entry of Judgment of Foreclosure and Sale be made in favor of plaintiff, 48 Bramhall Street Condominium Association, and against defendant, Kelly Moses Stone, on plaintiff's Complaint for Foreclosure by Civil Action. The court orders that if the defendant, her heirs and assigns, do not pay to plaintiff, its successors and assigns, the amount of the total claim due as of 1/1/14, $17,801.73, together with accrued interest and other charges as set forth above within ninety days of the date of this judgment, plaintiff, its successors and assigns, shall be entitled to exclusive possession of the real estate, and plaintiff may sell defendant's real estate, and disburse the proceeds of the sale, after deducting the expenses thereof, in accordance with this judgment and 14 M.R.S. § 6324 (2013).

If applicable, a writ of execution shall issue against defendant for the deficiency, provided that the statutory requirements are met.

Defendant and all other occupants are ordered to vacate the real estate upon expiration of the statutory ninety-day redemption period if defendant has not by that date redeemed the real estate in accordance with statutory procedure. Upon plaintiff's request, a writ of possession shall be issued to plaintiff against defendant and all other occupants for possession of the real estate if it is not redeemed as provided.

The names addresses of all parties to this action and their counsel are as follows:

48 Bramhall Street
Condominium Association
Drummond & Drummond, LLP
One Monument Way
Portland, Maine 04101

Kelly Moses Stone
c/o Richard Bryant, Esq.
Van Meer & Belanger, P.A.
20 York Street
Portland, ME 04101

The real estate, which is the subject of this foreclosure action, is situated at 48 Bramhall Street, Unit 3, Portland, Maine.

Plaintiff is ordered, after the expiration of the appeal period, to record an attested copy of this Judgment of Foreclosure and Sale and Order in the Cumberland County Registry of Deeds and to pay for the associated recording fees.

The Clerk is specifically directed pursuant to M.R. Civ. P. 79(a) to enter this judgment on the civil docket by a notation incorporating it by reference.

Date: June 13, 2014

Nancy Mills
Justice, Superior Court

**ORDER ENTERED IN COURT'S DOCKET**

ON_____6/13/14_____, **2014**     hrc

I hereby certify that all applicable appeal periods have expired without action.

Date:_____, 2014          _____

Clerk, Maine Superior Court

15